IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil No. PJM 09-1973 |
| v. | * | |
| | * | |
| **ECC PARTNERS, L.P.** | * | |
| | * | |
| Defendant, | * | |
| | * | |

## OPINION

### I.

The United States of America, on behalf of the Small Business Administration ("SBA"), filed a Complaint for Receivership and Injunction against ECC Partners L.P. ("ECC Partners"), a limited partnership licensed by the SBA as a Small Business Investment Company ("SBIC") pursuant to the Small Business Investment Act of 1958, as amended (the" Act"), 15 U.S.C. §661 et. seq., and its accompanying regulations, 13 C.F.R. §107.1 et. seq. (the "Regulations").

The Complaint alleged that ECC Partners was violating the Act and the Regulations in respect to capital requirements for SBICs of ECC Partners' type. Pursuant to 15 U.S.C. §687c, the SBA sought preliminary and permanent injunctive relief restraining ECC Partners, its managers, general partners, directors, officers, agents, employees, and others from making any disbursements of ECC Partners assets or otherwise using those assets. The SBA also asked the Court to take exclusive jurisdiction over all ECC Partners' assets and to appoint the SBA as receiver of ECC Partners for the purpose of marshaling and liquidating assets and satisfying the claims of creditors as determined by the Court.

On October 7, 2009, the Court entered a Consent Order granting the requested relief and

appointing the SBA as ECC Partners' Receiver.¹ Eventually, the Receiver filed a Recommended Disposition of Claims and a Motion for Entry of an Order Approving the Receiver's Recommended Disposition of Claims, Authorizing Payment of Approved Claims and Establishing Summary Disposition Procedures which the Court, by Order dated October 4, 2010, approved, subject to any claimant filing an opposition.

ECentury Capital Corporation ("ECentury"), ECC Partners' former management company, filed a Motion in Opposition to the Receiver's Recommended Disposition of Claims, on which the Court heard oral argument. In an oral opinion issued from the bench at close of the argument, followed by a summary written Order dated January 14, 2011, the Court **CONFIRMED** the SBA's Recommended Disposition of Claims and **DENIED** ECentury's Motion. This written opinion memorializes the Court's oral opinion.²

## II.

The relevant facts are these:

The SBA operates programs that seek to encourage the growth of small businesses. Under the Act and the Regulations, the SBA is authorized to license SBICs.³ *See* 15 U.S.C. §681. The SBICs in turn provide capital to small businesses. Pursuant to Section 303 of the Act, the SBA can provide financing to a SBIC through what is known as Participating Securities Leverage ("PS Leverage"). *See* 15 U.S.C. §683. By issuing a PS Leverage instrument, the SBA becomes a Preferred Limited Partner of the SBIC. In addition, when a SBIC is licensed, the license

---

1 The Court also established a process for the filing of claims against ECC Partners under which claimants were required to submit claims directly to the Receiver. Any claimant who opposed the Receiver's recommended disposition of its claim could file a Motion in Opposition to the Receiver's Recommended Disposition of its claim. The SBA, as Receiver, issued notices informing potential claimants of the claims process and procedures.

2 To the extent that there may be any inconsistencies between the Court's oral opinion and this written opinion, this opinion shall be deemed controlling.

3 For background on SBICs and the regulatory framework within which they operate, see generally *United States v. Fidelity Capital Corp.,* 920 F.2d 827, 829-831 (11th Cir. 1991).

application contains an acknowledgment that the SBIC will be operated in accordance with the Act and the Regulations, both of which place several restrictions on SBICs, including, among others, in regard to their financing and business decisions. *See United States v. Fidelity Capital Corp.*, 920 F.2d 827, 831 (11th Cir. 1991).

In August of 2000, ECC Partners' predecessor interest, ECentury Capital Partners, L.P., was licensed by the SBA as a SBIC pursuant to Section 301(c) of the Act.[4] *See* 15 U.S.C. §681(c). Thereafter, the SBA provided ECC Partners with $39.5 million in PS Leverage, in consequence of which the SBA became ECC Partners' Preferred Limited Partner. ECentury was ECC Partners' manager (i.e. investment advisor), pursuant to an Investment Advisory Agreement entered between it and ECC Partners (entered into through ECC Partners' general partner, ECentury Capital LLC) and approved by the SBA.[5] Under that Agreement, ECentury's management fee was to be equal to 2.5% of Combined Capital (defined as "the sum of Regulatory Capital and outstanding Leverage" in 13 C.F.R. §107.50). *See* Partnership Agreement Section 3.07(A).

Among its responsibilities, the SBA monitors the operation of all SBICs, in the course of which it undertakes annual reviews of the SBIC's financial statements. In 2006, after receiving ECC Partners' financial statement for the quarter ending September 30, 2006, the SBA determined that ECC Partners had what it noted was a "capital impairment condition."[6] Accordingly, on

---

4 *See* ECentury Capital Partners L.P. Agreement of Limited Partnership (the "Partnership Agreement") dated February 23, 2000 and Amended and Restated as of August 8, 2000. The Partnership Agreement states: "The Partnership has the powers and responsibilities, and is subject to the limitations, provided in the SBIC Act. The operations of the Partnership and the actions taken by the Partnership and the Partners will be conducted and taken in compliance with the SBIC Act." Section 2.01(a).
5 Thomas Dann, Esquire, functioned both as the President of ECentury (the manager of ECC Partners) and as managing director of ECentury Capital LLC (the general partner of ECC Partners).
6 Capital impairment is the degree to which the Regulatory Capital of a SBIC has deteriorated because of accumulated losses. Generally speaking, the Capital Impairment Percentage ("CIP") is calculated by adding the SBIC's undistributed net realized loss and net unrealized depreciation and dividing the result by the SBIC's private capital. *See* 13 C.F.R. §107.1840; SBA's, SBIC Program Standard Operating Procedure 10-06 (May 8, 2007), Chapter 6, Section 10 (*How do I Calculate Capital Impairment for Section 301(c)*

January 19, 2007 the SBA sent ECC Partners a letter stating that, upon reviewing the Licensee's Form 468 for the quarter ended September 30, 2006, the Office of SBIC Operations had noted that:

> [t]he Licensee's Capital Impairment Percentage ("CIP") increased to 74% for the period ended September 30, 2006 due to realized portfolio losses and unrealized losses. . . . [and that] the maximum permissible CIP for the Licensee is 60%. Accordingly, Operations has determined that a condition of Capital Impairment exists. The Licensee is hereby directed to cure this impairment to SBA's satisfaction within 15 days of the date of this letter.[7] . . . Otherwise, pursuant to 13 CFR §107.1820(f), upon expiration of the 15 day period, Operations will place the Licensee in Restricted Operations [and] . . . SBA will take all of the following actions: . . . Within 15 days of being placed in Restricted Operations the Licensee, must submit a twelve-month operating budget to SBA. SBA will review the budget and re-determine the Licensee's management fee. Effective the date Licensee is placed in Restrictive Operations and until SBA has reviewed and re-determined the Licensee's management fee, the Licensee will be required to reduce the management fee to 50% of the approved management fee contained in the Licensee's limited partnership agreement, unless the fee being paid currently is less than such reduced fee.

The letter further stated that:

---

*SBIC's?)* ("SOP 10-06"). A Capital Impairment Condition exists if the CIP exceeds permitted levels set forth in the Regulations and varies depending on the percentage of equity capital investments made by the SBIC. *See* 13 C.F.R. §107.1830(c)(2). In this case, since ECC Partners had a percentage of equity capital investments (at cost) of 67% and its ratio of outstanding leverage to leverage capital was over 100% but not over 200%, its maximum permitted capital impairment percentage was 60%. *Id*.

7  The letter stated that "[t]o cure the impairment, the Licensee will need to increase its Regulatory Capital by an amount not less than $6,810,100, plus an amount equal to any additional unrealized depreciation and operating expenses incurred subsequent to September 30, 2006."

The Licensee may elect to defer the payment of that portion of the management fee contained in the Licensee's limited partnership agreement that exceeds that reduced amount. However, payment of all deferred fees in excess of the reduced amount must be subordinated to all amounts payable to SBA.

It is undisputed that ECC Partners did not cure the condition of capital impairment as directed by the SBA. Therefore, as of February 5, 2007, the SBA placed ECC Partners in Restricted Operation status[8] and reduced ECentury's management fee to 50% of what had been approved in the original agreement (the "Reduced Amount"). Subsequently, the SBA and ECC Partners exchanged correspondence in which ECC Partners asked that the management fee be reduced by only 34% rather than the 50% directed by the SBA. The SBA declined to accept this request and notified ECC Partners of its decision to that effect in June 2007. In July 2007 ECC Partners acknowledged that ECentury's management fee would be reduced in the amount directed by the SBA.

ECC Partners' condition of capital impairment persisted such that by letter dated February 4, 2008, the SBA notified ECC Partners that, effective January 29, 2008, it had been transferred from restricted operation status to liquidation status. Thereafter, in September 2008 the SBA and ECC Partners entered into a Wind-Down Agreement under which ECC Partners would be allowed to liquidate its assets, provided it met certain requirements established by the SBA. In September 2009, by which time the SBA had become concerned about the ability of ECC Partners to self-liquidate, the SBA, pursuant to 15 U.S.C. § 687c, sought appointment as liquidating Receiver

---

8  13 C.F.R. §107.1820(e) lists eleven types of failures and/or conditions that constitute a Restricted Operation Condition upon the occurrence of any one of which the SBA may avail itself of remedies. The list includes capital or liquidity impairment. *See* 13 C.F.R. §107.1820(e)(3).

of ECC Partners, which, as previously noted, the Court granted.

Following the claims procedure established by the Court, ECentury, ECC Partners' former management company, sought to recover $2,570,977 in unpaid management fees under its Investment Advisory Agreement with ECC Partners. The Receiver recommended that $84,139 of ECentury's claim be paid immediately and that $2,486,838 of the claim be deferred and subordinated until the leverage owed the SBA as a Preferred Limited Partner was satisfied. No objection has been taken with regard to the payment of the $84,139. As to the remaining $2,486,838, ECentury filed a timely Opposition asking the Court to approve payment of that amount prior to the SBA's preferred limited partnership interest.

The Court considers ECentury's claim.

### III.

ECentury alleges that neither ECC Partners nor ECentury ever agreed to subordinate payment of its management fees in excess of the Reduced Amount to amounts that might be owed to the SBA and further that the SBA lacks the authority to unilaterally subordinate ECentury's claim. ECentury therefore argues that its claim should be paid before SBA's PS Leverage is satisfied. In the alternative, ECentury argues that even if the SBA were deemed to have the authority to subordinate management fees, it may do so only after conducting a review that includes consideration of various factors as outlined in the SBA's own standard operating procedures. ECentury alleges that the SBA never asked ECC Partners to submit specific information regarding management expenses prior to the January 19, 2007 letter or for many months thereafter. Thus, ECentury argues that the SBA could not and did not conduct the review required in order to make a re-determination of ECC Partners' management fee prior to imposing

6

the 50% reduction.[9]

The SBA takes the position that, pursuant to both the Act and the Regulations, it possesses the authority to re-determine and subordinate the management fee of a SBIC where the SBA holds PS Leverage, as is it does in this case. In any event, the SBA argues that ECC Partners, through which ECentury's claim is derived, specifically accepted its offer to defer and subordinate management fees in excess of the Reduced Amount. ECC Partners' acceptance of this offer, says the SBA, is evidenced by ECC Partners' audited financial statements, including, for example, Form 468 for the period ending December 31, 2007, at Note 4 to the following effect:

> On February 5, 2007, the SBA placed the Fund in Restricted Operations. As a result, the SBA required the Fund to reduce its management fee to 50% of the approved management fee per the Partnership Agreement (the reduced amount) effective February 5, 2007. The Fund may elect to defer the payment of that portion of the management fee allowed per the Partnership Agreement that exceeds the reduced amount. <u>However, payment of all deferred fees in excess of the reduced amount must be subordinated to all amounts payable to the SBA.</u> Accordingly, the Fund has recorded a contingent management fee payable of $772,725 at December 31, 2007.
> (emphasis added)

A similar note is included in ECC Partners' Form 468 for the period ending December 31, 2008, in which the recorded contingent management fee for that period was $1,628,785. Accordingly, the SBA asks the Court to affirm its finding that ECentury's claim of unpaid management fees is subordinated to all amounts owed to the SBA as ECC Partners' Preferred Limited Partner.

---

9 ECentury cites the January 19, 2007 letter, which states that the SBA would "review the budget and re-determine the Licensee's management fee" after the licensee had submitted a twelve-month operating budget to the SBA.

## IV.

"[A] receivership created under 15 U.S.C. § 687c is governed by principles applicable to federal equitable receivers generally." *United States v. Royal Bus. Funds Corp*., 724 F.2d 12, 16 (2d Cir. 1983). "In a receivership proceeding, the district court has broad powers and wide discretion in crafting relief. *Quilling v. Trade Partners, Inc*., 572 F.3d 293, 298 (6th Cir.2009) (citation omitted); *see also United States v. Vanguard Inv. Co*., 6 F.3d 222, 226-27 (4th Cir. 1993) (discussing a district court's discretionary supervision of an equitable receivership). Where a petitioner seeks relief from a receivership, "'the receiver ordinarily has no power to adjudicate that claim. Instead, that authority lies within the sound discretion of the appointing court.'" *United States v. Penny Lane Partners, L.P.,* No. 06-1894 (GEB), 2010 WL 5796465, at * 5 (D.N.J. Oct. 26, 2010) (quoting Barry Stuart Zisman, Banks and Thrifts: Government Enforcement and Receivership § 18.04[1] (2008)). "In accepting or rejecting the claims of creditors, as well as in filing a report of findings of fact and conclusions of law, a receiver acts like a master." *See e.g. United States v. Fairway Capital Corp*., 433 F.Supp.2d 226, 231 (D.R.I. 2006) (citation omitted), aff'd 483 F.3d 34 (1st Cir. 2007). A court reviews *de novo* all objections to findings of fact and conclusions of law made or recommended by a master. Fed. R. Civ. P. 53(f)(3)-(4).

Here, the Receiver has concluded that ECentury's claim for unpaid management fees is subordinated to amounts owned to the SBA. The Court reviews that determination *de novo*.

## V

### A.

ECentury first argues that the SBA lacks the authority to unilaterally subordinate a licensee's approved management expenses in favor of its own equity interest. The Court disagrees.

8

Under the Act, when a SBIC is licensed, the licensee agrees to abide by the provisions of the Act and the Regulations. The Regulations provide that, upon a determination by the SBA that there has been noncompliance by a licensee with their terms, including when a Restricted Operation Condition has occurred, some or all of the licensee's rights may be forfeited. The SBA has the right to impose certain remedies if a Restricted Operation Condition occurs and is not cured in timely fashion to the SBA's satisfaction. As set forth in the Regulations:

> Upon the occurrence of any Restricted Operations Condition, and until such condition(s) are cured to SBA's satisfaction within a time period determined by SBA (but not less than 15 days), upon written notice SBA shall have the following rights, and you consent to SBA's exercise of any or all of such rights: . . . (4) To review and re-determine your approved Management Expenses.

13 C.F.R. § 107.1820(f)(4). Among other things, a licensee is not allowed to have a condition of capital impairment greater than that allowed under 13 C.F.R. §107.1830(c) and, if it does, the SBA indisputably has the right to re-determine the management fee. *See* 13 C.F.R. 107.1820(f)(4).

In this case, in the early part of 2007, the SBA made a determination that a Restricted Operation Condition had occurred with ECC Partners, namely, that it had a rate of capital impairment greater than the percentage allowed under the Regulations, 74% as opposed to 60%. The SBA's January 19, 2007 letter gave ECC Partners 15 days to cure the problem. When the condition was not cured, on or about February 5, 2007, the SBA placed ECC Partners in Restricted Operation status and, pursuant to 13 C.F.R. §107.1820(f)(4), reduced ECentury's management fee to 50% of the previously approved amount. The January 19, 2007 letter, gave ECC Partners the option of deferring that portion of the management fee that exceeded the Reduced Amount, so long as the deferred portion would be subordinated to the SBA's claims. Although ECC Partners

9

subsequently requested that the approved management fee be reduced by 34% rather than 50%, that proposal was rejected by the SBA after its review as of June of 2007 and ECC Partners accepted the 50% reduction.

The Court finds that the Regulations are explicit as to the SBA's authority; that when a licensee's financial condition becomes shaky, the SBA may take certain specific actions regarding the licensee's management fees and expenses. Indeed, it appears that the SBA would have the right to extinguish a licensee's management fee altogether. Be that as it may, it is certainly the case that the SBA may remediate a capital impairment condition by reducing the management fee and offering the licensee the option of carrying the portion in excess of the reduced amount on its balance sheet such that, should things eventually turn around, the licensee would have the opportunity to recover up to the originally approved management fee once the SBA's preferred limited partnership claim has been paid. ECentury's argument that the SBA lacks authority to subordinate the fee fails to persuade. There is nothing inherently unreasonable or unfair about a preferred equity partner (which, after all, provided financing for the business) to require that satisfaction of its equity interest come before payment of a portion of the management fee.

**B.**

ECentury also argues that to enforce the subordination clause, ECC Partners and/or ECentury would had to have separately consented to subordination of the management fee. The Court finds that, insofar as any consent was required, it was built into the Act and the Regulations. Beyond that, no consent was required.

Under the Partnership Agreement and the Investment Advisory Agreement, any rights that ECentury had were entirely derivative and limited by whatever rights and authority ECC Partners had. ECC Partners was and is subject to and its rights are limited by the Act and the

Regulations. ECC Partners was not authorized to incur any expenses greater than what the Regulations and the SBA allowed. Among the possible restrictions accepted by ECC Partners when it was licensed as a SBIC was that, if a Restricted Operation Condition occurred and was not cured in timely fashion to the SBA's satisfaction, the SBA would have the right to impose certain remedies. 13 C.F.R. §107.1820(f). These included SBA's right to reduce, even extinguish, the management fee it originally approved. When the SBA offered ECC Partners the more accommodating option of deferring and subordinating that portion of the management fee in excess of the Reduced Amount, ECC Partners had a decision to make. It could elect to defer and subordinate a portion of its management fee, or possibly see it eliminated altogether. The SBA did not need to obtain separate consent from ECC Partners or from ECentury to reduce the approved management fee to 50%, nor was it obliged to offer either entity the option of deferring and subordinating the portion of the management fees in excess of that amount.

In addition, except for asking that the management fee be reduced by 34% rather than by 50%, nothing in the record suggests that ECC Partners or ECentury ever lodged any objection to the subordination condition after receiving the SBA's January 19, 2007 letter. ECC partners' subsequent financial statements and accompanying notes clearly show that ECentury, ECC Partners, and their auditors operated under the assumption that payment of management fees in excess of the Reduced Amount would be deferred and subordinated to all amounts payable to the SBA as Preferred Limited Partner of ECC Partners. Indeed, it was Thomas Dann, on behalf of ECC Partners, through its General Partner, ECentury Capital LLC, who supplied the auditors with this information, signed off on the audited reports, and submitted them to the SBA. No one, therefore, — not ECentury, not ECC Partners, not Thomas Dann— can claim the least surprise at the SBA's insistence on the subordination term.

**VI.**

Alternatively, ECentury argues that the SBA reduced its management fee without conducting the review required by its own operating procedures. ECentury points to two documents:

First, SBA's, SBIC Program Standard Operating Procedure 10-06 (May 8, 2007), Chapter 8, Section 3(a) (*What is the process for placing a SBIC into Restricted Operations?*) ("SOP 10-06") which states:

> If a licensee exceeds the maximum allowable capital impairment level, you should issue the standard cure letter (Appendix 8-1) which provides that the licensee will be placed in Restricted Operations if it does not cure the capital impairment within the time period specified in the cure letter. The standard cure letter specifies SBA's remedies if the licensee is placed in Restricted Operations. If the licensee is placed in Restricted Operations, the management fee will be reduced in accordance with the procedures outlined in the standard cure letter.

Second, SBA's SBIC Liquidation Standard Operating Procedure 10-07-1 (Dec. 21, 2007), Chapter 3, Section 3(d) (*How do you Develop a Liquidation Strategy for PS SBIC Cases?*) ("SOP 10-07-1") which states:

> Reduce Management Fees, if appropriate. Within 10 days of the meeting with the PS SBIC management, <u>you should reset the PS SBIC's management fees, if appropriate</u>. . . . Factors to be considered when setting the fee include the number of Assets in the PS SBIC's portfolio of Assets, board representation, stage of Assets (seed, early, mezzanine or later stage) and the number of Impact Assets. The adjusted management fee shall be implemented prospectively and normally

12

amended, if appropriate, on an annual basis. You must review expenditures not covered by management fees, i.e., legal and audit, verifying that they are reasonable. If you determine they are excessive, then you may require the PS SBIC to reduce these expenses. (emphasis added)

The SBA's SOP 10-06 refers to the standard cure letter that it issues when it determines that a SBIC has a condition of capital impairment. The SBA's January 19, 2007 letter in this case was the standard cure letter, which clearly indicated that, unless ECC Partners cured the condition of capital impairment within 15 days, the approved management fee would be reduced by 50%.

As for SBA's SOP 10-07-1, the factors it lists refer to the analysis a SBA officer is expected to conduct "to reset" the management fee, "if appropriate," once a SBIC has been transferred from operation status to liquidation status as part of the liquidation strategy for that SBIC. In this case, ECC Partners' management fee had been reduced to 50% as of February 5, 2007, the date it was placed on Restricted Operation status. The fee was never reset as part of the liquidation strategy for ECC Partners, presumably because it was not deemed "appropriate" to do so. Strictly speaking, therefore, SOP 10-07-1 does not apply.

But in any event, different levels of review may be appropriate whether the SBA is deciding to reduce a management fee at the first sign of trouble or whether it is revisiting the situation later on. The later review may result in an adjustment of the fee, "if appropriate," or simply leaving the reduction in place. What level is "appropriate" is entirely fact-specific. If a SBIC's problem can be easily diagnosed and remedied from obvious facts, consideration of the full panoply of factors may be unnecessary. In such a situation, the SBA, like a doctor whose patient walks into his office bleeding profusely from a life-threatening open wound, does not need to verify whether the patient is maintaining a healthy lifestyle as the patient approaches old age.

That, essentially, is the case here. The SBA received ECC Partners' 2006 balance sheets which showed significant capital impairment. The management fee was far and away the largest expense item and its reduction the clearest way to remediate the situation. Whatever analysis the SBA might have undertaken at that point, it in fact needed to undertake very little to be able to conclude with reason that immediate reduction of the management fee to 50% was an "appropriate" response to the critical condition of capital impairment. Nor would extensive analysis be required, under the circumstances, to deem it "appropriate" to keep the management fee at the reduced amount already in place when the same critical condition of capital impairment persisted weeks or months later. There is, in short, no basis for the Court to find that the SBA failed to appropriately "re-determine" the management fee.

The Court therefore affirms the Receiver's determination that ECentury's deferred management fee should be paid before the SBA's PS leverage.

## VI.

For the foregoing reasons, the SBA's Recommended Disposition of Claims, as approved in the Court's Order Approving the Receiver's Recommended Disposition of Claims, Authorizing Payment of Approved Claims and Establishing Summary Disposition Procedures [Document No. 14], is **CONFIRMED** and ECentury's Motion in Opposition to the Receiver's Recommended Disposition of Claims is **DENIED.**

A Separate order has already issued.

**January 14, 2011**

                                                      /s/
                                          PETER J. MESSITTE
                                  UNITED STATES DISTRICT JUDGE